UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

OLDENBURG GROUP INC.,
        Plaintiff,

v.                                                Case No. 07C0285

FRONTIER-KEMPER CONSTRUCTORS INC.,
        Defendant.

---

## DECISION AND ORDER

Plaintiff Oldenburg Group Incorporated ("OGI") brings this diversity action against defendant Frontier-Kemper Constructors, Inc. ("FKC"), alleging that defendant breached its obligation to indemnify plaintiff for damages and expenses incurred in a suit against it in Illinois state court. FKC seeks a declaration that it has no such obligation. The parties now cross-move for summary judgment.

### I. BACKGROUND

This dispute arises out of a December 7, 2000 contract between OGI's wholly-owned subsidiary, Lake Shore Mining Company, Inc. ("LSM") and White County Coal LLC ("WCC"), an Illinois mining company, to design, supply and oversee the installation of a Vertical Belt System ("VBS") at WCC's Pattiki mine in White County, Illinois. The central component of the VBS is a vertical conveyor belt with buckets. The buckets are filled with coal from within WCC's mine, which the belt then hoists to the surface.[1]

---

[1]The interested reader can watch a video advertisement for vertical hoisting systems, including vertical belt systems, at FKC's website. See http://www.frontierkemper.com/lakeshore.html (follow "watch the video" hyperlink) (last visited June 12, 2008). The video contains a discussion of the White County Coal project at 5:24. A more detailed description of vertical conveying systems can be found at

On August 29, 2001, OGI and LSM sold the VBS contract to FKC as part of an asset purchase agreement with FKC. LSM had not yet completed the VBS design work, and the asset purchase agreement dealt with how FKC would do so. Section 16 provided that LSM and OGI would make their engineering team available to FKC to help complete the project and described engineers – Don Shaw and Ernie Boggs – as "employees" of LSM and OGI.[2]

FKC agreed to indemnify LSM and OGI for "[a]ny defect, error or problem arising from the design or design engineering" of the VBS. (Asset Purchase Agreement § 7(d).) Further, although LSM and OGI represented to FKC that they had, prior to the asset sale, satisfied all of their contractual obligations under the contracts being transferred to FKC (including the VBS contract), LSM and OGI expressly excluded the design of the VBS from this representation, and the asset purchase agreement reiterated that FKC agreed to hold LSM and OGI harmless "with respect to any defect, error or problem arising from the design or design engineering" on the VBS contract. (Asset Purchase Agreement § 12.) The apparent intent of these provisions was to allocate all liability relating to the design of

---

http://www.frontierkemper.com/verticalbelts.html (last visited June 12, 2008).

[2]Section 16 states:

LSM and OGI shall make its employees Bob Reigler, Don Shaw and Ernie Boggs available to FKC for services with respect to the Contracts at whatever times and for whatever durations as FKC shall in its sole discretion direct for finishing the design engineering and for any re-design engineering as the same may become necessary (but not general project management) during the course of performance of the Contract known as the White County Coal Contract.

(Wouters Aff., Ex. 2 [hereinafter "Asset Purchase Agreement"] at § 16, pp.20-21.)

the VBS to FKC, whether the liability arose out of design activities occurring before or after the asset sale.

After closing, FKC completed the final design work for the VBS and, in April 2002, began installing it. The VBS was up and running by October 2002. However, on June 14, 2005, an electrical fault caused the vertical belt to stop and reverse direction during operations, damaging the VBS. On January 19, 2006, WCC sued FKC in Illinois state court, alleging that FKC was liable for the VBS malfunction and related damages. FKC then impleaded OGI, seeking indemnification for WCC's claims relating to the design of the VBS.

Given the language of the asset purchase agreement discussed above, which allocates responsibility for the VBS design to FKC, it would appear that FKC has things backwards. FKC agreed to indemnify OGI, not the other way around. But FKC, relying on a quirk within OGI's corporate structure, has developed an argument to get around the indemnity language. I discuss this argument below. In doing so, I necessarily touch on the merits of FKC's claims in the Illinois action. However, I do this only to provide the background necessary to understand FKC's arguments in this action, not to adjudicate the merits of the Illinois action.

When LSM and WCC executed the VBS contract, LSM was OGI's wholly-owned subsidiary. OGI had other wholly-owned subsidiaries, including another mining company named Stamler Corporation. Although it is unclear whether Stamler was involved in the VBS project, Stamler's existence supplies the basis for FKC's argument in this case. This is so because LSM's design engineering team included individuals who were technically

3

Stamler employees – namely, Shaw and Boggs.[3] As mentioned, the asset purchase agreement described Shaw and Boggs as employees of OGI, which suggests that OGI and FKC understood that any work performed by Boggs and Shaw on the VBS project would be done as agents of OGI, not agents of Stamler. But in the Illinois action, FKC has taken the position that Shaw and Boggs worked for Stamler. Specifically, FKC alleges that prior to the asset purchase, LSM and Stamler (both OGI subsidiaries) entered into an oral contract in which Stamler agreed to perform design engineering for the VBS project. (Am. Compl., Ex. 2 [hereinafter "Third Party Complaint"] at ¶ 14, pp. 3-4.) This "oral contract" appears to mean the design work performed by Shaw and Boggs. FKC alleges that Stamler breached the oral contract by failing to properly design the VBS, and that Stamler's flawed design caused the VBS to malfunction. Therefore, argues FKC, in the event that FKC has any liability to WCC arising out of the design of the VBS, Stamler must indemnify FKC.

FKC seems to have developed this oral contract theory in an effort to do an end-run around the indemnity provisions of the asset purchase agreement, which prohibit FKC from suing LSM or OGI in connection with Shaw and Boggs's design work. This is evident from some of the theory's flaws. First, FKC alleges that the oral contract was between LSM and Stamler, not FKC and Stamler, and it is not clear why FKC believes it has any rights under an oral contract to which it was not a party. FKC's third-party complaint in the Illinois action is silent on the issue. Presumably, FKC plans to argue that because it purchased some

---

[3] I use the word "employee" in a lay sense, not meaning to take a position on whether Shaw and Boggs were Stamler employees for purposes of agency, vicarious liability or other legal doctrines.

4

of LSM's assets, it acquired LSM's rights under the oral contract. But nothing in the asset purchase agreement indicates that this alleged oral contract existed, much less that FKC purchased LSM's rights under it. Second, the asset purchase agreement describes Shaw and Boggs as OGI employees, which leads to the obvious inference that FKC understood that, however they were classified within the OGI corporate structure, Shaw and Boggs worked for OGI, not Stamler, for purposes of the VBS project.

In any event, putting the merits of FKC's oral contract theory aside, the important point is that FKC argues that because Shaw and Boggs were Stamler employees, FKC can hold Stamler responsible for the design flaws that FKC would have attributed to OGI but for the indemnification provisions of the asset purchase agreement. Essentially, FKC seeks to exploit a loophole created by OGI's failure to realize at the time it negotiated the asset purchase agreement that Shaw and Boggs could be viewed as Stamler employees rather than OGI employees. Had OGI realized that FKC might argue that Shaw and Boggs were Stamler employees, OGI probably would have negotiated an indemnification provision on behalf of Stamler in addition to the provisions that it already negotiated on behalf of itself and LSM.

As it turns out, however, OGI inadvertently closed the Stamler loophole several years before the VBS malfunctioned. On December 31, 2003, OGI restructured and caused a number of its wholly-owned subsidiaries, including Stamler and what remained of LSM, to be merged into OGI. Thus, by the time that the FKC filed its third-party complaint in the Illinois action, Stamler had ceased to exist as a suable entity separate from OGI. This meant that if FKC wanted to put the blame on Shaw and Boggs, it had to sue OGI. But any suit against OGI involving the design of the VBS would fall squarely

5

within the indemnification provisions of the asset purchase agreement. In what looks like an attempt to avoid this problem, FKC pleaded its third party complaint in Illinois against OGI as the "successor corporation to Stamler Corporation." (Third Party Complaint at p. 10.) In FKC's view, by describing OGI as Stamler's successor, FKC has not actually sued OGI, and thus the indemnification provisions do not apply. OGI takes issue with this view, and it filed the present action to enforce the indemnification provisions of the asset purchase agreement.

## II. DISCUSSION

### A. Applicable Legal Standards

Summary judgment is appropriate only when the materials before the court demonstrate "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Miller v. American Airlines, Inc., 525 F.3d 520, 523 (7th Cir. 2008).

In a case in which subject matter jurisdiction is founded on diversity of citizenship, I apply Wisconsin law, including its choice of law rules. See, e.g., Tanner v. Jupiter Realty Corp., 433 F.3d 913, 915 (7th Cir. 2006). Here, the parties' contract contains a choice of law provision selecting Michigan law, and the parties agree that Michigan law therefore governs this action.

Under Michigan law, "[a]n indemnity contract is construed in the same fashion as are contracts generally." Zurich Ins. Co. v. CCR & Co., 576 N.W.2d 392, 395 (Mich. Ct. App. 1997). In interpreting a contract, it is a court's obligation to determine the intent of the parties by examining the language of the contract according to its plain and ordinary

6

meaning. In re Smith Trust, 745 N.W.2d 754, 757-58 (Mich. 2008). If the contractual language is unambiguous, courts must interpret and enforce the contract as written because an unambiguous contract reflects the parties' intent as a matter of law. Id. at 758. Only when the contract is ambiguous may the parties resort to extrinsic evidence. Coates v. Bastian Bros., Inc., 741 N.W.2d 539, 543 & n.3 (Mich. Ct. App. 2007).

In the present case, the parties agree that the dispositive issue is the interpretation of the indemnification provisions of the assert purchase agreement. They further agree that this is an issue of contract interpretation that the court can perform based on the unambiguous language of the asset purchase agreement and without resort to extrinsic evidence. (Pl.'s Prop. Findings of Fact & Mem. of Law in Supp. at 17; Def.'s Br. in Opp. at 8.) Thus, no material facts are in dispute, and the only question is who is entitled to judgment as a matter of law.[4]

**B. Analysis**

Under the plain language of the asset purchase agreement, OGI is entitled to summary judgment. The relevant language provides:

---

[4]In response to a number of OGI's proposed findings of fact, FKC asserts that it needs further discovery before it can properly respond. The parties' factual dispute involves the merits of the Illinois action rather than the interpretation of the asset purchase agreement, and FKC continues to assert that I can resolve this contract dispute based on the plain text of the indemnification provisions and without resort to extrinsic evidence. (Def.'s Br. in Opp. at 1-2; Def.'s Reply Br. at 1-2.) As explained below, I agree that the indemnification provisions are unambiguous and that therefore additional discovery is unnecessary. Although I discuss some of the facts that FKC believes are disputed, I emphasize here that my decision is based on the plain text of the indemnification provision of the asset purchase agreement. I discuss other facts only to explain FKC's arguments, not to take a position with respect to the disputed facts. And although I am obviously suspicious of the oral contract theory that FKC asserts in the Illinois action, my decision would be exactly the same even if FKC's claims in the Illinois action were meritorious.

7

> 7. Indemnification by FKC.  Notwithstanding the closing, FKC agrees to indemnify, defend and hold <u>LSM and OGI</u> harmless from and against any and all damage, liability, loss, judgment, fine, penalty, cost, deficiency and expenses (including reasonable attorneys' fees) and also any other costs and expenses incident to proceedings or investigations or the defense or settlement of <u>any claim arising out of, resulting from or relating to</u>:
>
> . . . .
>
> (d) <u>Any defect, error or problem arising from the design or design engineering on the White County Coal Contract</u>.

(Asset Purchase Agreement § 7 (emphasis added).)  Thus, FKC must indemnify for "any claim arising out of, resulting from or relating to . . . [a]ny defect, error or problem arising from the design or design engineering on the White County Coal Contract" that is asserted against "LSM [or] OGI."  In the Illinois action, WCC and FKC have brought claims arising out of an alleged defect in the design or design engineering on the White County Coal Contract.[5]  Those claims are asserted against OGI.  Therefore, such claims fall squarely within the indemnification language of the asset purchase agreement.

FKC's position is that the claims made in the Illinois action are asserted against OGI only in its capacity as the successor to Stamler, and that therefore FKC should be viewed as having sued Stamler, not OGI.  While it may be true that the Illinois claims are asserted against OGI only as the successor to Stamler, this does not change the fact that the claims are asserted against OGI, not Stamler.  Once Stamler merged into OGI, Stamler ceased to exist, and all of Stamler's liabilities became OGI's liabilities.  See Leannais v. Cincinnati,

---

[5]FKC does not dispute that the claims asserted in the Illinois action involve a defect, error or problem in the design of the VBS.  Therefore, I will not discuss the specific allegations of the Illinois pleadings except to note that it is clear from the face of such pleadings that the claims against OGI all arise out of the design of the VBS.  (Third Party Complaint at pp. 9-10 (alleging breach of implied warranties to properly design VBS).)

8

Inc., 565 F.2d 437, 439 (7th Cir. 1977) ("A merger . . . involves that actual absorption of one corporation into another, with the former losing its existence as a separate corporate entity."); see also, James C. Freund, Anatomy of a Merger § 4.6.1 (1975).[6] Thus, it is irrelevant that FKC named "OGI as the successor to Stamler" as a defendant in the Illinois action. FKC cannot reach into the corporate ether, extract the essence of Stamler, and sue it. FKC has sued OGI – period. And because FKC's suit arises out of the design of the VBS, FKC must indemnify OGI.

An alternative characterization of FKC's argument is that the indemnification provisions should be interpreted such that they do not apply to claims made against OGI as the successor to other VBS designers, such as Stamler, since the indemnification provisions were meant to apply only to OGI's design activities. However, the text does not support the proposition that the indemnification provisions were intended to apply only to OGI's design activities. Instead, the text broadly provides that FKC must indemnify OGI for claims arising out of "the design" of the VBS, and contains no restriction relating to who did the designing.[7]

---

[6]Stamler was a Kentucky corporation, and Kentucky law provides that all parties to a merger cease to exist after the merger, except for the surviving corporation, which in this case was OGI. See Ky. Rev. Stat. § 271B.11-060(1)(a). Under Kentucky law, the surviving corporation assumes the liabilities of the extinguished corporation. Id. § 271B.11-060(1)(c).

[7]Indeed, even if Stamler were still a separate legal entity, FKC might have to indemnify OGI for Stamler's design work. If FKC sued Stamler, Stamler might turn around and sue OGI for contribution or indemnification. The latter suit by Stamler against OGI would be a suit arising out of the design of the VBS and would thus trigger FKC's duty to defend and indemnify OGI.

9

Because the text of the asset purchase agreement does not help FKC, it turns to policy reasons, arguing that a rule of law should be adopted that prevents corporations from using mergers to manipulate indemnification provisions. The gist of FKC's argument is that if OGI is allowed to bring Stamler's liabilities within the scope of the indemnification provisions by merging with it, companies will begin using mergers to exploit indemnification clauses and dodge legitimate claims. However, there is no reason to think that FKC's proposed rule of law is needed to guard against this type of abuse. Sophisticated companies such as OGI and FKC know that parent companies merge with their subsidiaries all the time.[8] If at the time of negotiating the asset purchase agreement FKC thought it was acquiring contractual rights against Stamler that it wanted to preserve, it could have expressly exempted those rights from the indemnity granted to OGI. This express exemption could have been drafted to survive any change in Stamler's corporate structure. Most likely, FKC would not have asked for, and OGI would not have agreed to, such an exemption, since the obvious intent behind the indemnification provisions was to allocate all liability for the design of the VBS to FKC and away from OGI and its subsidiaries, including Stamler. FKC's agreement to assume all such liability was probably part of the consideration for the asset purchase, and the failure to expressly state that the indemnification provisions <u>protect</u> Stamler was probably due to the fact that everyone understood that Shaw and Boggs worked for OGI, not Stamler. (<u>See</u> Asset Purchase Agreement § 16 (describing Shaw and Boggs as LSM and OGI employees) & Sched. 16

---

[8]Indeed, mergers of parents and subsidiaries are so common that state business codes usually have provisions uniquely tailored to them, <u>see</u>, <u>e.g.</u>, Ky. Rev. Stat. § 271B.11-040, and such mergers even have their own name, <u>see</u> Black's Law Dictionary 1003 (7th ed. 1999) (entry for "short-form merger").

10

(listing Shaw and Boggs as OGI employees).)   In any event, the important point is that <u>if</u> FKC thought that it was retaining rights to sue Stamler for the design of the VBS, FKC could have preserved those rights through careful drafting.  FKC cannot now ask this court to re-write the parties' contract to include a provision that FKC failed to secure on its own during the bargaining process.

Moreover, it is doubtful that manipulative mergers of the kind envisioned by FKC would ever take place.  FKC has produced no evidence indicating that the OGI-Stamler merger was motivated, even in part, to bring Stamler within the protection of the indemnification provisions.  Indeed, the merger took place years before the VBS malfunctioned.  More generally, circumstances would have to be just right before such a tactic would be successful.  When two companies merge, the liabilities of the former corporation are by operation of law assumed by the surviving entity.  <u>See</u>, <u>e.g.</u>, Freund, <u>supra</u>.  Only if the surviving corporation has a contract that contains an indemnification provision with just the right wording will any liabilities be extinguished.  In the present case, for example, the indemnification clause comes into play only because it protects against liability "arising out of" the design of the VBS. Any claim that FKC has against Stamler not arising out of such design lives on as a claim against OGI.  Further, mergers have costs as well as benefits, <u>see</u>, <u>e.g.</u>, 3 James D. Cox & Thomas Lee Hazen, <u>Cox & Hazen on Corporations</u> § 22.11, at 1333 (2d ed. 2003) ("The combination into a single corporate form pursuant to merger or consolidation is not always an advantage."), and it would take a pretty substantial lawsuit to motivate two corporations to merge for the sole purpose of exploiting the scope of a fortuitously-worded indemnification clause. Thus, FKC's fear that "parties could creatively avoid responsibility for their actions by selective mergers that

11

would rob other parties of the ability to pursue their claims against such entities" is unfounded. (Def.'s Br. in Opp. at 12.) I therefore doubt that the Michigan courts would create a rule of contract interpretation designed to discourage such mergers. Instead, they would apply the contract's plain text, which in the present case mandates that OGI's motion for summary judgment be granted.

### III.  CONCLUSION

**For the reasons stated,**

**IT IS ORDERED** that OGI's motion for summary judgment is **GRANTED**, and that FKC's motion for summary judgment is **DENIED**.

**IT IS FURTHER ORDERED** that a telephonic scheduling conference will be held on **July 10, 2008 at 2:00 p.m.** to schedule further proceedings regarding the amount of OGI's damages.  The court will initiate the call.

Dated at Milwaukee, Wisconsin, this 18 day of June, 2008.

/s_____
LYNN ADELMAN
District Judge